IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | CRIMINAL ACTION NO. 06-654-1 |
| | : | |
| v. | : | |
| | : | |
| THOMAS REYES | : | CIVIL ACTION NO. 11-6234 |

## MEMORANDUM

**Padova, J.**                                                                    **August 8, 2013**

Before the Court is Defendant Thomas Reyes's: (1) Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255; and (2) Motion for Leave to File an Amended § 2255 Motion.  For the following reasons, we deny both Motions.  At the same time, we grant a certificate of appealability limited to the following issue: whether the decision of the United States Supreme Court in <u>Alleyne v. United States</u>, 133 S. Ct. 2151 (2013), applies retroactively to cases on collateral review.

## I.      BACKGROUND

On September 4, 2007, Thomas Reyes was convicted by a jury of attempted interference with commerce by robbery, in violation of 18 U.S.C. § 1951(a) (Count One); using and carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c) (Count Two); and felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) (Count Three). The charges arose from an incident that occurred on July 16, 2006, at the Gomez Grocery store in Philadelphia, Pennsylvania.  The evidence admitted at trial established that Reyes entered the Gomez Grocery wearing gloves and a bandana over his face.  (N.T. 08/29/07 at 113; N.T. 08/30/07 at 38.)  He locked the door behind him, drew a semi-automatic firearm, announced a robbery, and ordered the employees and customers to the floor.  (N.T. 08/29/07 at 116-18; N.T. 08/30/07 at 6, 37.)  He jumped onto the front counter, and was then grabbed from behind by a

store employee, Tomas Santana, who wrestled him to the floor. (N.T. 08/29/07 at 121-23; N.T. 08/30/07 at 40-41.) During the ensuing struggle with Santana and another employee, Eddie Cruz, Reyes fired at least two rounds from the gun. (N.T. 08/29/07 at 130; N.T. 08/30/07 at 42.) Reyes was ultimately subdued when Santana struck him on the head with an applesauce jar. (N.T. 08/29/07 at 130; N.T. 08/30/07 at 45-46.)

On August 12, 2008, Reyes filed a post-verdict motion asking us to vacate the jury's verdict and grant him a new trial pursuant to Federal Rule of Criminal Procedure 33, on the grounds that: (1) the Government failed to prove that he intended to affect interstate commerce; (2) the jury instructions were inadequate because they failed to address his intent to affect interstate commerce; (3) there was a variance between the Indictment and the evidence at trial because no evidence was produced showing that he intended to affect interstate commerce; and (4) the evidence at trial was insufficient to establish that his actions affected interstate commerce. United States v. Reyes, Crim. A. No. 06-654, 2008 WL 4950006, at *1-2 (E.D. Pa. Nov. 18, 2008). We rejected all of Reyes's arguments, concluding that the Government was not required to prove that Reyes had the specific intent to interfere with interstate commerce in order to prove that he violated 18 U.S.C. § 1951(a), and that the evidence at trial established that the attempted robbery had the requisite effect on interstate commerce. Id. at *2-3. We therefore denied Reyes's post-verdict motion in its entirety.

Reyes was sentenced on December 3, 2008, to a total of 180 months of imprisonment, five years of supervised release, a fine of $1,000.00, and a special assessment of $300.00. Reyes appealed his conviction to the United States Court of Appeals for the Third Circuit. He raised three issues on direct appeal: (1) there was insufficient evidence at trial to convict him of

attempted robbery; (2) Section 1951(a) was unconstitutional as applied to his conduct; and (3) the Indictment and jury instructions were inconsistent because the Indictment suggested that § 1951(a) required an intent to affect interstate commerce, but the jury was instructed that it did not have to find that he intended to affect interstate commerce.  United States v. Reyes, 363 F. App'x 192, 194-97 (3d Cir. 2010).  The Third Circuit rejected those arguments and affirmed Reyes's conviction on January 27, 2010.  Id. at 197.  Reyes filed a petition for writ of certiorari to the United States Supreme Court, which was denied on October 4, 2010.  Reyes v. United States, 131 S. Ct. 252 (2010).

Reyes filed his timely pro se § 2255 Motion on October 4, 2011.  The Motion raises the following grounds for relief: (1) he was not put on proper notice of the charges against him because the Indictment led him to believe that proof of an intent to interfere with interstate commerce was an element of § 1951(a); (2) there was a constructive amendment of the Indictment because it alleged that the attempted robbery potentially affected interstate commerce, whereas the proof at trial showed an actual effect; (3) the Indictment was insufficient because it did not identify the interstate party with whom the Gomez Grocery was in business; and (4) his trial counsel was ineffective for: (a) failing to brief his post-verdict motion; (b) making a "deal" with the Government not to present evidence of his version of the events at the Gomez Grocery; (c) failing to adequately meet with him before trial; and (d) failing to conduct adequate pretrial investigations.  We appointed Reyes counsel and held evidentiary hearings on his § 2255 Motion on September 14, 2012, October 18, 2012, and April 4, 2013.  On July 1, 2013, Reyes filed a Motion for Leave to File an Amended § 2255 Motion seeking to assert six newly-stated claims, including four based on Alleyne v. United States, 133 S. Ct. 2151 (2013).

3

## II.    LEGAL STANDARD

Reyes has moved for relief pursuant to 28 U.S.C. § 2255, which provides as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a). "Section 2255 does not provide habeas petitioners with a panacea for all alleged trial or sentencing errors." United States v. Perkins, Crim. A. No. 03-303, Civ. A. No. 07-3371, 2008 WL 399336, at *1 (E.D. Pa. Feb. 14, 2008) (quoting United States v. Rishell, Crim. A. No. 97-294-1, Civ. A. No. 01-486, 2002 WL 4638, at *1 (E.D. Pa. Dec. 21, 2001)). In order to prevail on a § 2255 motion, the movant's claimed errors of law must be constitutional, jurisdictional, "a fundamental defect which inherently results in a complete miscarriage of justice," or "an omission inconsistent with the rudimentary demands of fair procedure." Hill v. United States, 368 U.S. 424, 428 (1962).

## III.    DISCUSSION

### A.    Grounds One, Two, and Three

Reyes did not raise any of his first three grounds for relief on direct appeal. "Because collateral review under § 2255 is not a substitute for direct review, a movant ordinarily may only raise claims in a 2255 motion that he raises on direct review." Hodge v. United States, 554 F.3d 372, 378-79 (3d Cir. 2009) (citing Bousley v. United States, 523 U.S. 614, 621 (1998)). This means that a movant has "procedurally defaulted all claims that he neglected to raise on direct

appeal." Id. at 379 (citing Bousley, 523 U.S. at 621). However, the movant may raise his claims in a motion brought pursuant to § 2255 "if he can prove either that he is actually innocent of the crime for which he was convicted, or that there is a valid cause for the default, as well as prejudice resulting from the default." Id. (citing Bousley, 523 U.S. at 622).

Reyes argues that his counsel's ineffectiveness was cause for his failure to raise Grounds One, Two, and Three on direct appeal. Cause necessary to excuse a procedural default must be an occurrence beyond a defendant's control that cannot be fairly attributed to him. See McCleskey v. Zant, 499 U.S. 467, 493 (1991) ("In procedural default cases, the cause standard requires the petitioner to show . . . 'some objective factor external to the defense . . . .'" (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986))). Prejudice necessary to excuse a procedural default means that any alleged error worked to a defendant's "actual and substantial disadvantage." United States v. Frady, 456 U.S. 152, 170 (1982)). "Ineffective assistance of counsel that rises to the level of a Sixth Amendment violation constitutes cause for a procedural default." Hodge, 554 F.3d at 379 (citations omitted). However, there is "no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument." United States v. Sanders, 165 F.3d 248, 253-54 (3d Cir. 1999) (citations omitted).

### 1.    Ground One: Notice of the Charges in the Indictment

In Ground One, Reyes argues that he was not put on proper notice of the charges against him because the Indictment led him to falsely believe that the Government would have to prove that he specifically intended to interfere with interstate commerce in connection with the § 1951(a) charge. "Generally, each count of the indictment must set forth a sufficient description of the crime charged." United States v. Werme, 939 F.2d 108, 111 (3d Cir. 1991). To determine

whether an indictment puts a defendant on notice of the charges against him, "we look at the entire indictment" and consider "'whether the indictment contains the elements of the offense intended to be charged and sufficiently appraises the defendant of [the crime] he should be prepared to meet.'" Id. at 112 (alteration in original) (quoting United States v. Wander, 601 F.2d 1251, 1258 (3d Cir. 1979)) (other citation omitted). In other words, an indictment need only put a defendant on notice of the charged offense. See id.

Section 1951(a) reads, in pertinent part: "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery . . . shall be fined under this title or imprisoned not more than twenty years, or both." 18 U.S.C. § 1951(a). The Indictment states that Reyes "attempted to obstruct, delay and affect commerce and the movement of articles and commodities in commerce, by robbery" in violation of § 1951(a). (Indictment at 1.) The Indictment also discloses the date of the attempted robbery, the location of the Gomez Grocery, and that Reyes attempted "to take and obtain cash" from the store. (See id. at 1-2.) The Indictment thus clearly "contains the elements of the offense intended to be charged" under § 1951(a) and sufficiently appraised Reyes of the facts underlying the attempted robbery charge against him. Werme, 939 F.2d at 112 (quotation and citation omitted).

Furthermore, we reject Reyes's argument that a plain reading of the Indictment indicates that the Government would have to prove that Reyes intended to affect interstate commerce. "It is well-established that a specific intent to affect interstate commerce is not an element of [§ 1951(a)]," Reyes, 363 F. App'x at 195, and Reyes has identified nothing in the Indictment that could have reasonably led him to a contrary conclusion. Reyes also fails to articulate any way in

6

which his alleged misunderstanding of the Indictment prejudiced his defense. We conclude that Ground One is without merit and, therefore, Reyes's counsel was not ineffective for failing to raise it on direct appeal. We further conclude that Reyes cannot show cause and prejudice to excuse his procedural default on Ground One, and accordingly, we deny Reyes's Motion as to Ground One.

2.     Ground Two: Constructive Amendment

In Ground Two, Reyes argues that there was a constructive amendment of the Indictment because the proof at trial established that the attempted robbery actually affected interstate commerce, whereas the Indictment alleges that the attempted robbery only potentially affected interstate commerce. "A constructive amendment occurs where a defendant is deprived of his 'substantial right to be tried only on charges presented in an indictment returned by a grand jury.'" United States v. Syme, 276 F.3d 131, 148 (3d Cir. 2002) (quoting United States v. Miller, 471 U.S. 130, 140 (1985)). There is a constructive amendment to an indictment where:

> in the absence of a formal amendment, the evidence and jury instructions at trial modify essential terms of the charged offense in such a way that there is a substantial likelihood that the jury may have convicted the defendant for an offense differing from the offense the indictment returned by the grand jury actually charged.

United States v. Daraio, 445 F.3d 253, 259-60 (3d Cir. 2006) (citing Miller, 471 U.S. at 140; and United States v. Floresca, 38 F.3d 706, 710 (4th Cir. 1994)). Reyes does not argue that he was convicted of an offense different than that identified in the Indictment. Thus, we conclude that there was no constructive amendment of the Indictment in this case.

Reyes's argument, rather, is more akin to a claim that there was a variance between the evidence established at trial and the facts alleged in the Indictment. A variance occurs "'where

the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment.'" Daraio, 445 F.3d at 261 (alteration in original) (quoting United States v. Castro, 776 F.2d 1118, 1121 (3d Cir. 1985)). "[A] variance can result in a reversible error only if it is likely to have surprised or otherwise has prejudiced the defense." Id. at 262 (citing United States v. Schurr, 775 F.2d 549, 553-54 (3d Cir. 1985)). "'A variance does not prejudice a defendant's substantial rights (1) if the indictment sufficiently informs the defendant of the charges against him so that he may prepare his defense and not be misled or surprised at trial, [or] (2) if the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense.'" Id. (alteration in original) (quoting United States v. Schoenhut, 576 F.2d 1010, 1021-22 (3d Cir. 1978)).

The evidence at trial proved that the attempted robbery had an actual effect on interstate commerce. (See N.T. 08/30/07 at 148-49 (establishing that many items available for purchase in the store had traveled in interstate commerce); N.T. 08/29/07 at 138-39 (establishing that the store was forced to shut down for nearly eight hours for cleanup during which time the store could not receive or sell its goods).) The Indictment states that the Gomez Grocery "was engaged in and affecting interstate commerce" and that Reyes "attempted to obstruct, delay, and affect commerce and the movement of articles and commodities in commerce" by attempting "to take and obtain cash." (Indictment at 1.) The Indictment does not suggest that the Government would prove that the attempted robbery had only a potential effect on interstate commerce. Therefore, the facts proved at trial—that the attempted robbery had an actual effect on interstate commerce—were not "'materially different from those alleged in the indictment.'" Daraio, 445

F.3d at 261 (quoting <u>Castro</u>, 776 F.2d at 1121). Accordingly, we conclude that there was no variance between the Indictment and the evidence established at trial.

Reyes has also failed to articulate any way in which he was prejudiced by the alleged inconsistency. The Government's proof of an actual effect on interstate commerce was not likely to surprise or otherwise prejudice Reyes's defense because, as we have already determined, the Indictment sufficiently informed him of the § 1951(a) charge against him. Accordingly, we conclude that Ground Two is without merit and, therefore, Reyes's counsel was not ineffective for failing to raise it on direct appeal. We further conclude that Reyes cannot show cause and prejudice to excuse his procedural default on Ground Two, and accordingly, we deny Reyes's Motion as to Ground Two.

### 3.    Ground Three: Sufficiency of the Indictment

In Ground Three, Reyes argues that the Indictment was insufficient because it fails to identify the interstate party with which the Gomez Grocery was in business, and that omission prevented him from developing a defense that the attempted robbery did not affect interstate commerce. An indictment need only contain "'a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" <u>United States v. Huet</u>, 665 F.3d 588, 594 (3d Cir. 2012) (quoting <u>United States v. Resendiz-Ponce</u>, 549 U.S. 102, 110 (2007)). "'[N]o greater specificity than the statutory language is required so long as there is sufficient factual orientation' to permit a defendant to prepare his defense . . . ." <u>Id.</u> at 595 (alteration in original) (quoting <u>United States v. Kemp</u>, 500 F.3d 257, 280 (3d Cir. 2007)). "Generally, an indictment will satisfy these requirements where it informs the defendant of the statute he is charged with violating, lists the elements of a violation under the statute, and specifies the time period during

which the violations occurred." Id. (citations omitted).  However, an indictment "is not required to set forth [the Government's] entire case." Id. (citations omitted).

The Indictment charges Reyes with violating § 1951(a) and lists the elements of a violation of § 1951(a).  (See Indictment at 1-2.)  The Indictment also states that the Gomez Grocery "was engaged in and affecting interstate commerce, providing food and drink, or goods and services, which were produced and transported from other states to Pennsylvania, to residents of the Commonwealth of Pennsylvania and out-of-state residents" on or about July 16, 2006.  (Id. at 1.)  The Indictment thus identifies the time period during which the attempted robbery occurred as well as the nature and circumstances of the Gomez Grocery's participation in interstate commerce.  We conclude that the allegations in the Indictment were sufficient to allow Reyes to prepare a defense to the interstate commerce element of the § 1951(a) charge, and we reject Reyes's argument that the Indictment was required to identify the specific evidence that the Government intended to present at trial to prove that the Gomez Grocery was engaged in interstate commerce.  See Huet, 665 F.3d at 594.

Accordingly, we conclude that Ground Three is without merit and, therefore, Reyes's counsel was not ineffective for failing to raise it on direct appeal.  Reyes cannot show cause and prejudice to excuse his procedural default on Ground Three, and accordingly, we deny Reyes's Motion as to Ground Three.[1]

---

[1]To the extent that Reyes asserts independent claims that his counsel provided ineffective assistance by failing to object at trial on Grounds One, Two, and Three, those arguments also fail because counsel cannot be ineffective for failing to object on meritless grounds.  Sanders, 165 F.3d at 253-54 (citations omitted).

B.    Ground Four: Ineffective Assistance

In Ground Four, Reyes argues that his trial counsel, Elliot M. Cohen, provided him with ineffective assistance in violation of the Sixth Amendment.[2]  A claim for ineffective assistance of counsel is based on the Sixth Amendment right to counsel, which exists "'in order to protect the fundamental right to a fair trial.'"  Lockhart v. Fretwell, 506 U.S. 364, 368 (1993) (quoting Strickland v. Washington, 466 U.S. 668, 684 (1984)) (additional citations omitted).  A claim for ineffective assistance of counsel must meet the two-part test advanced by the Supreme Court in Strickland.  First, Reyes must show that counsel:

> made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, [Reyes] must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland, 466 U.S. at 687.  More precisely, Reyes must show that (1) his attorney's performance was "unreasonable under prevailing professional norms, and, unless prejudice is presumed, that (2) there is a 'reasonable probability that, but for counsel's unprofessional errors, the result would have been different.'"  United States v. Day, 969 F.2d 39, 42 (3d Cir. 1992) (internal citation omitted) (citing Strickland, 466 U.S. at 687-91; and quoting id. at 694).  Reyes contends that Mr. Cohen was ineffective for: (1) failing to brief his post-verdict motion; (2) making a "deal" with the Government not to present evidence of his version of the events at the

---

[2]Reyes's claim for ineffective assistance of counsel is not procedurally defaulted even though he failed to raise it on direct appeal.  "[F]ailure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under § 2255."  Massaro v. United States, 538 U.S. 500, 509 (2003).

Gomez Grocery; (3) failing to adequately meet with him before trial; and (4) failing to conduct adequate pretrial investigations.[3]

### 1.    Post-Verdict Motion

Reyes argues that Mr. Cohen was ineffective for failing to brief his post-verdict motion. On September 6, 2007, Mr. Cohen filed a post-verdict motion on Reyes's behalf, seeking a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c), on the ground that the Government failed to prove that the attempted robbery affected interstate commerce. On October 15, 2007, we dismissed that motion without prejudice because it had been filed without an accompanying memorandum of law, in violation of Local Rule of Criminal Procedure 47.1. Reyes admits that Mr. Cohen's failure to brief that motion "had no [e]ffect on the trial" (§ 2255 Mot. at 15), and he fails to articulate any prejudice whatsoever that resulted from that error. In fact, Reyes obtained new counsel who filed a post-verdict motion on August 12, 2008, which asked us to vacate the jury's verdict and grant Reyes new trial. That motion raised the very same claim that Mr. Cohen raised in the first post-verdict motion, and we denied that claim on the merits on November 18, 2008. Thus, we conclude that Reyes has not established prejudice on this ground for relief, and accordingly, we deny Ground Four insofar as Reyes argues that Mr. Cohen was ineffective for failing to brief his post-verdict motion.

---

[3]Reyes's § 2255 Motion also asserts that Mr. Cohen was ineffective for failing to request a bill of particulars regarding the interstate party with which the Gomez Grocery was engaged in business. However, Reyes does not mention that ground for relief in his briefs, much less explain how Mr. Cohen's performance in connection with that alleged error was unreasonable or how he was prejudiced by it. Therefore, to the extent that Reyes asserts a claim for relief on that ground, we deny the Motion.

2.      The "Deal" with the Government

Reyes argues that Mr. Cohen was ineffective for making a "deal" with the Government not to present evidence that the attempted robbery was actually a failed drug deal, and his failure to present that evidence prejudiced Reyes's defense.  Before opening statements on the first day of Reyes's trial, Mr. Cohen asked the U.S. Attorney at sidebar whether he was going to introduce evidence that Reyes made inculpatory admissions about the attempted robbery while he was incarcerated.  (N.T. 08/29/07 at 75-77.)  The U.S. Attorney responded that he did not intend to introduce any of Reyes's admissions unless Mr. Cohen suggested to the jury that the attempted robbery was actually a failed drug deal.  (Id. at 77-81.)  Mr. Cohen then explained that he would not put on a defense that the Gomez Grocery was engaged in drug dealing because:

> As a practical matter I don't think I'm going to be able to get out any of the hoped testimony that this business is actually a front for a drug operation.  I don't think there's any way I could ever get anybody to admit that.  Even in the movies they couldn't do that. So I'm going to have to examine – cross-examine based on pure credibility, based on other motives, based on any number of different things, inconsistencies in other statements, and so on and so forth.  That's really all I have.  It's – the story about this being a front for a drug operation is my client's version.

(Id. at 81-82.)  Mr. Cohen assured the U.S. Attorney that he would not proceed on the "failed drug deal" defense because he "couldn't even come close to proving evidence" to support that theory.  (Id. at 86; see also id. at 87 (stating that Reyes's version of the events was "completely unprovable").)

Reyes argues that Mr. Cohen's "decision to give up [his] only defense . . . was clearly below the standard guaranteed by the sixth amendment."  (Rebuttal Mem. at 13.)  "Strickland and its progeny make clear that counsel's strategic choices will not be second-guessed by *post-*

13

*hoc* determinations that a different trial strategy would have fared better." Rolan v. Vaughn, 445 F.3d 671, 681-82 (3d Cir. 2006) (citing Strickland, 466 U.S. at 689). To show constitutionally deficient performance, the defendant must overcome a strong presumption that "counsel's conduct falls within the wide range of reasonable professional assistance" and "'might be considered sound trial strategy [under the circumstances].'" Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). "'[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" Knowles v. Mirzayance, 556 U.S. 111, 124 (2009) (quoting Strickland, 466 U.S. at 690).

At the September 14, 2012 hearing, Mr. Cohen testified that putting on the "failed drug deal" defense at trial would have been "a very, very bad idea, to say the least" because it was "almost assuredly going to justify his conviction." (09/14/12 Hr'g Tr. at 72.) Mr. Cohen explained that:

> I mean, I couldn't necessarily put Mr. Reyes up – I mean, obviously he has the right to testify, but I couldn't recommend that he get up and testify. I mean, we've got all these allegations in this case of witness tampering, we've got allegations of suborning perjury, admissions . . . . [b]ut he's also got a prior criminal conviction for robbery which is going to come in if he takes the stand [i]n this case. So I think it would have been suicide ultimately . . . to raise a defense like that.

(Id. at 73.) According to Mr. Cohen, if the jury heard evidence that Reyes had attempted to intimidate witnesses prior to trial, it "would have been back in 30 seconds." (Id. at 75-76.) Mr. Cohen further explained that the "failed drug deal" defense would have portrayed Reyes as a drug dealer, and Mr. Cohen could not "justify the use of [drug dealing] to disprove that crime [of

attempted robbery]." (<u>Id.</u> at 73.) He also testified that, prior to trial, Reyes agreed with his decision not to present the "failed drug deal" defense. (<u>Id.</u> at 75.)

We conclude that Mr. Cohen's failure to present the "failed drug deal" defense did not constitute an unreasonable choice of trial strategy. Mr. Cohen testified that such a defense was not only unprovable at trial, but would have allowed the Government to introduce evidence that Reyes had been previously convicted of robbery and had attempted to intimidate witnesses before trial. Moreover, Mr. Cohen's uncontroverted testimony establishes that Reyes agreed not to present the "failed drug deal" defense. Under these circumstances, Mr. Cohen's strategic decision not to present the "failed drug deal" defense should "not be second-guessed by *post-hoc* determinations that a different trial strategy would have fared better." <u>Rolan</u>, 445 F.3d at 681-82 (citing <u>Strickland</u>, 466 U.S. at 689). Thus, we conclude that Reyes has not established that Mr. Cohen's choice of trial strategy was unreasonable, and accordingly, we deny Ground Four insofar as Reyes argues that Mr. Cohen was ineffective for failing to present evidence that the attempted robbery was actually a failed drug deal.

3.    Meetings Prior to Trial

Reyes argues that Mr. Cohen was ineffective for failing to adequately meet with him prior to his trial. Reyes contends that Mr. Cohen only personally met with him on two occasions, just days before his trial was scheduled to begin. Reyes also contends that as a result of those meetings, he felt that "Mr. Cohen was extremely unprepared to defend his case at trial" and concluded "that he needed to retain new counsel." (Rebuttal Mem. at 11.)

In meeting with and communicating with a defendant prior to trial, a defense attorney "must only comply with professional norms." <u>United States v. Bellinger</u>, Crim. A. No. 02-644-

15

01, Civ. A. No. 09-4555, 2010 WL 3364335, at *3 (E.D. Pa. Aug. 24, 2010) (citing Strickland, 466 U.S. at 687). "These norms require no more than a minimal level of contact between an attorney and client." Id. at *4 (citations omitted). "Limited or shallow communications from counsel are not the equivalent of ineffective representation" unless the defendant can show that a deficiency in his attorney's communication with him prejudiced his defense. United States v. Gorham-Bey, Crim. A. No. 07-442, Civ. A. No. 12-366, 2012 WL 3155652, at *6 (W.D. Pa. Aug. 2, 2012). Consequently, where a defense attorney is "well-aware of [the] key aspects and minute details of [the defendant's] case and consistently and ardently presented [his] position," a defendant's "disappointment with the amount of time he spent communicating with his defense attorney fails to establish that his counsel did not function as a meaningful adversary" to the prosecution. Hall v. Bartkowski, Civ. A. No. 11-4148, 2013 WL 1385610, at *5 (D.N.J. Apr. 3, 2013) (quotation omitted).

Mr. Cohen testified at the September 14, 2012 hearing that his law firm had initially represented Reyes in state court before the case was adopted by the Government for federal prosecution. (09/14/12 Hr'g Tr. at 6.) Attorneys at Mr. Cohen's law firm also represented Reyes at his federal preliminary hearing, detention hearing, arraignment, pretrial conference, and during plea negotiations with the Government (Cohen Decl. at 2-3), and Mr. Cohen consulted with those attorneys in preparation for Reyes's trial. (09/14/12 Hr'g Tr. at 64.) Mr. Cohen could not recall precisely how many times he had personally met with Reyes prior to trial, but he testified that he visited Reyes at the Federal Detention Center ("FDC") "on a few occasions." (Id. at 7, 38.) He also testified that, prior to trial, Reyes "would call the office many times, we would speak to him, we would certainly speak to his family." (Id. at 47, 65.) According to Mr. Cohen,

16

he and Reyes's mother "had a fair amount of discussion both during the trial and prior to the trial" about Reyes's case. (Id. at 57.)

The FDC logbooks, from the time that Reyes was incarcerated there prior to trial, indicate that Mr. Cohen visited Reyes at the FDC on at least two occasions prior to Reyes's trial. (10/18/12 Hr'g Tr. at 114.) Mr. Cohen first visited the FDC on August 21, 2007, from 11:25 a.m. to 12:16 p.m., during which time he visited Reyes and another inmate. (Id. at 117-18.) Mr. Cohen again visited the FDC on August 26, 2007, from 3:15 p.m. to 3:45 p.m., during which time he visited Reyes and another inmate. (Id. at 118.) The FDC was not able to produce records of any telephone calls that Reyes may have made to Mr. Cohen's law firm, or records of visits between Reyes and Mr. Cohen that occurred outside the FDC, during the time that Reyes was held at the FDC prior to trial. (Id. at 126-28.)

The record thus establishes that Mr. Cohen personally met with Reyes at the FDC on at least two occasions prior to trial, and that other members of his firm represented Reyes at several prior hearings, appearances, conferences, and proffer sessions. We find that Mr. Cohen was a credible witness, and based on his testimony, we also find that he had numerous telephone conversations with Reyes and Reyes's family prior to trial. We thus conclude that the evidence shows that Mr. Cohen had "more than a minimal level of contact" with Reyes in preparing for Reyes's trial. Bellinger, 2010 WL 3364335, at *4 (citations omitted).

Furthermore, Reyes has not established that the lack of additional meetings with Mr. Cohen prejudiced his defense. Reyes concedes that, before trial, he communicated to Mr. Cohen his version of the events at the Gomez Grocery, the existence of allegedly important medical and ballistic records, and the identity of potential defense witnesses. (See Rebuttal at 9A-12.) Reyes

has not pointed to any record evidence that indicates that Mr. Cohen was unaware of the details of Reyes's case, or that additional meetings with Mr. Cohen would have changed the result at trial. We thus conclude that Reyes's "disappointment with the amount of time he spent communicating with his defense attorney fails to establish that his counsel did not function as a meaningful adversary" to the Government. Hall, 2013 WL 1385610, at *5 (quotation omitted). We further conclude that Reyes has not established prejudice on this ground for relief, and accordingly, we deny Ground Four insofar as Reyes argues that Mr. Cohen was ineffective for failing to adequately meet with him before trial.

### 4. Pretrial Investigations

Reyes argues that Mr. Cohen was ineffective for failing to conduct adequate pretrial investigations. Reyes specifically argues that Mr. Cohen failed to contact potential defense witnesses and obtain and use at trial exculpatory ballistic and medical records, all of which would have contradicted the Government witnesses' accounts of the attempted robbery. In conducting pretrial investigations, defense counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. Defense counsel's "particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. "For a failure to investigate to constitute ineffective assistance, a defendant must show what exculpatory evidence would have been uncovered by further investigation." United States v. Franklin, 213 F. Supp. 2d 478, 488 (E.D. Pa. 2002) (citation omitted). In other words, "a defendant must show that the investigation would have 'produced useful information not already known to trial counsel.'" Id. (citations omitted).

a.     Contacting Potential Defense Witnesses

Reyes asserts that prior to trial, he identified and provided contact information to Mr. Cohen for three potential witnesses, his mother Milagros Deborba, his sister Rosemarie Quintana, and Jose Ayala, each of whom could testify about his "prior relationship" with the Gomez Grocery and that he was involved in drug dealing with Eddie Cruz at the Gomez Grocery.  (Rebuttal Mot. at 9A, 16.)  Reyes asserts that Mr. Cohen failed to interview or elicit testimony at trial from any of those witnesses.

"In making decisions about whether to interview a witness, counsel may rely on what his client tells him."  Levan v. United States, 128 F. Supp. 2d 270, 280 (E.D. Pa. Jan. 18, 2001) (citing Lewis v. Mazurkiewicz, 915 F.2d 106, 113 (3d Cir. 1990)).  "Depending on the defendant's statements to counsel, the need for further investigation may be considerably diminished or eliminated altogether."  Id. (citing Strickland, 466 U.S. at 691).  Defense counsel is "'not bound by an inflexible constitutional command to interview every possible witness. Instead, counsel [i]s simply required to exercise reasonable professional judgment in deciding whether to interview [a witness].'"  Moore v. DiGuglielmo, 489 F. App'x 618, 625 (3d Cir. 2012) (alterations in original) (quoting Lewis, 915 F.2d at 113).

Mr. Cohen testified at the September 14, 2012 hearing that he "would have been duty-bound" to interview any potential defense witness that Reyes had identified to him.  (09/14/12 Hr'g Tr. at 52.)  Although Reyes claims that he asked Mr. Cohen to interview Milagros Deborba, Rosemarie Quintana, and Jose Ayala, Mr. Cohen testified that Reyes never identified or asked him to contact any potential defense witnesses prior to trial.  (Id. at 52, 55.)  Mr. Cohen further

denied that Reyes had identified any witnesses to him who could testify about his "prior relationship" with the Gomez Grocery or that the store was involved in drug dealing.[4] (Id. at 74.)

Moreover, even if Mr. Cohen knew of or should have known of those individuals, or any other potential defense witnesses, he had no obligation to interview them if their "testimony would not have exculpated" Reyes, or if their "testimony would have been inconsistent with a defense theory." Levan, 128 F. Supp. 2d at 280 (citation omitted). We have already determined that Mr. Cohen's decision to forego the "failed drug deal" defense was not an unreasonable trial strategy. Consequently, testimony concerning Reyes's drug-dealing connection with the Gomez Grocery would have been inconsistent with the defense theory presented at trial and, therefore, Mr. Cohen was not obligated to interview any witnesses who may have testified to those facts. We therefore conclude that Reyes has not established prejudice on this ground for relief, and accordingly, we deny Ground Four insofar as Reyes argues that Mr. Cohen was ineffective for failing to interview potential defense witnesses prior to trial.

b.      Ballistic Evidence

Reyes argues that Mr. Cohen was ineffective for failing to obtain exculpatory ballistic evidence that would have contradicted the Government witnesses' testimony that Reyes was the

---

[4]At the September 14, 2012 hearing, Reyes also introduced a summary of a proffer session that he attended on January 23, 2007 with Mr. Cohen's associate, Mr. Stefanski, and an FBI agent. (Def.'s Ex. 8 at 1.) Mr. Cohen admitted that he was "sure" that he had reviewed the summary of that proffer session prior to trial. (09/14/12 Hr'g Tr. at 55.) The summary contains Reyes's account of the incident at the Gomez Grocery and names several persons, including Eddie Cruz and individuals Reyes identified only as "Fendi," "Jose," and "Red," who may have been aware that the Gomez Grocery was connected to drug dealing. (Def.'s Ex. 8 at 2-3.) However, there is no evidence in the record that shows that Reyes provided full names or contact information for those individuals, or asked Mr. Cohen or another attorney at his law firm to interview any of those individuals in preparation for trial.

only armed individual, and the only individual who was injured, during the attempted robbery. Reyes contends that there were other bullet holes found at the Gomez Grocery that were not discovered by investigating police, and that a bystander told the police that a witness was shot during the incident. (See Rebuttal Mem. at 9A-10, 15.) He maintains that those two facts could have been used to impeach the Government witnesses' version of the attempted robbery.

Eddie Cruz testified at trial that after the attempted robbery, he found three bullet holes in the interior of the Gomez Grocery, while the police officers only discovered one bullet hole during their investigation. (See N.T. 08/29/07 at 163-64.) Reyes contends that this testimony supports the conclusion that there was another armed individual in the store that day. However, Cruz also testified at trial that Reyes fired his gun three times during the attempted robbery, thereby explaining the possible presence of three bullet holes. (Id. at 130.) Thus, the presence of three bullet holes, without any other evidence of another armed individual in the Gomez Grocery on July 16, 2006, was simply not probative of a conclusion that there was, in fact, another gunman in the store, and would not have been effective to impeach the testimony of the Government witnesses that only Reyes was armed that day.

Reyes also points out that the police report indicates that one witness, William Jackson, observed on the day of the incident that "[t]he guy that stands at the front door" of the Gomez Grocery had suffered a gunshot wound. (Def.'s Ex. 1 at LTS00036.) Reyes argues that Jackson's report constitutes evidence that could have been used to impeach the Government witnesses' testimony that no witnesses had been shot during the incident. However, Jackson did not identify the person who he thought had been shot, and stated that he did not actually see any gunshot wound on that person, but only saw that there was "a lot of blood running down his

arm." (Id. at LTS00037.) Furthermore, Jackson was the only witness at the scene, out of eleven witnesses interviewed that day, who mentioned that someone may have been shot. (See id. at LTS00028-LTS00048.) Even if Jackson's report contained a fact that could have been used to impeach the Government witnesses' testimony, the impeachment value of cross-examination on that fact would have been minimal. We thus conclude that Reyes has not established prejudice on this ground for relief, and accordingly, we deny Ground Four insofar as Reyes argues that Mr. Cohen was ineffective for failing to obtain and introduce at trial exculpatory ballistic evidence.

c.  Medical Records

Reyes argues that Mr. Cohen was ineffective for failing to obtain and introduce at trial his July 16, 2006 medical records, which reflect that he was shot, not hit in the head with an applesauce jar, during the attempted robbery. Reyes maintains that those records should have been used to "impugn the key eyewitnesses' credibility by raising a founded suggestion that their account was a fabrication conceived to deflect suspicions they had shot Mr. Reyes themselves." (Def.'s Supplemental Br. at 9.)

Reyes was treated at Albert Einstein Medical Center ("Einstein") on July 16, 2006, following his arrest for the attempted robbery. (Def.'s Ex. 6 at EINSTEIN0001.) Reyes arrived at Einstein at 12:38 p.m. (Id. at EINSTEIN00011.) Upon admission, his chief complaint was recorded as "GSW to head."[5] (Id. at EINSTEIN0001.) The Emergency Physician Record from July 16, 2006 indicates that "ent" and "exit" wounds were located on Reyes's left forehead and scalp, and that the "exit" wound was closed with a stitch. (Id. at EINSTEIN0009.) The Trauma Record from the same day likewise indicates two wounds on Reyes's left temple and scalp. (Id.

---

[5]"GSW" is an abbreviation for "gunshot wound." (See id. at EINSTEIN009.)

at EINSTEIN00011.)  Reyes was also given a "brain/cervical spine/coronals" CT scan which showed "[n]o radiopaque foreign bodies" and "asymmetric soft tissue swelling in the left frontal region."  (Id. at EINSTEIN00027.)

Reyes argues that these records establish that he was actually shot in the head during the attempted robbery, and was not hit in the head with an applesauce jar, which contradicts Cruz's and Santana's testimony.  At the October 18, 2012 hearing, Reyes presented the expert report of Dr. Angelo T. Scotti, who, after reviewing the July 16, 2006 Einstein records, opined that "there is no evidence to support the claims that Mr. Reyes had any soft tissue or bleeding injuries related to blows from a jar."  (Def.'s Ex. 10 at 2.)  Dr. Scotti's report notes that the records contained no evidence of "scalp wounds found on examination and no CT abnormalities indicating any head injuries other than the gunshot wound.  The scalp wounds, bleeding and loss of consciousness were related to the gunshot wound."  (Id.)  His report further states that Einstein physicians did not note any swelling that would have resulted from a blow from a blunt object. (Id. at 2.)  Dr. Scotti also opined that there were no gunpowder burns on Reyes's scalp which would indicate that a gun was fired in close range to his head.  (Id. at 2.)  Dr. Scotti concluded that Reyes's head injury was caused by a gunshot that "was not point blank, is unlikely to have been self-administered and was the cause of Mr. Reyes['s] reported head injuries, bleeding or unconsciousness."  (Id. at 3.)

At the April 17, 2013 hearing, the Government presented the expert report of Dr. Ian Hood.  Dr. Hood's report indicates that, contrary to Dr. Scotti's conclusions, Dr. Hood "found nothing in the Einstein Hospital records to refute the original testimony that the defendant was struck by a jar several times in a struggle with older males."  (Gov't Ex. 3 at 3.)  He opined that

"it was just as likely that [the two wounds on Reyes's scalp] were lacerations as an entrance and exit gunshot wound," and that although the emergency room records indicate that Reyes was shot, emergency room staff "have an abysmal record of identifying entrance and exit gunshot wounds."  (Id.)  At the hearing, Dr. Hood testified that if emergency room staff "know the person's been in a fight and a gun went off and they've got a wound in the scalp that looks like a gunshot wound," those physicians will assume that the wound is a gunshot wound "until they determine otherwise, and that's, in fact, what they did here."  (04/17/13 Hr'g Tr. at 149.)  In Reyes's case, Dr. Hood's report noted that emergency room staff failed to irrigate or pass a probe between his two scalp wounds to connect them as gunshot wounds, and that the CT scan showed no metallic particles that would have been left behind if Reyes had been shot in the head.  (Gov't Ex. 3 at 3.)  Dr. Hood also opined that Dr. Scotti's reliance on the lack of gunpowder burns on Reyes's scalp was misplaced, because evidence of close-range firing of a gun would have been deposited on the cap and do-rag that Reyes wore during the incident.  (Id.)

At trial, three witnesses independently testified that Reyes entered the Gomez Grocery with a firearm, announced a robbery, and ordered customers and employees to the floor.  (N.T. 08/29/07 at 116-18; N.T. 08/30/07 at 8-9, 27, 37.)  Of those three witnesses, Cruz and Santana testified that during the ensuing struggle, Reyes was hit over the head with an applesauce jar. (N.T. 08/29/07 at 130; N.T. 08/30/07 at 45-46.)   In addition, Benjamin Barefield, a fourth eyewitness who was present in the Gomez Grocery during the struggle, testified that Santana hit Reyes over the head with an applesauce jar.  (N.T. 08/30/07 at 64-65.)  A photograph of the bloody applesauce jar was also admitted at trial.  (Id. at 44-46, 162.)  Thus, the overwhelming evidence at trial established that Reyes was, in fact, hit on the head with an applesauce jar.

Moreover, although Reyes asserts that the records would have constituted important impeachment evidence that Reyes had actually been shot during the incident, evidence that Reyes had suffered a grazing gunshot wound was already in the record. Santana actually testified at trial that, besides being hit over the head with the applesauce jar during the struggle for Reyes's gun, "the gun went off" and "kind of scraped [Reyes] on the side." (Id. at 54.) Thus, any suggestion that the July 16, 2006 Einstein records showed that Reyes had been shot would have had added little value to Reyes's defense. See Albrecht v. Horn, 485 F.3d 103, 129 (3d Cir. 2007) (noting that "a court must consider the strength of the evidence in deciding whether the Strickland prejudice prong has been satisfied" (quotation omitted)).

For all of these reasons, we conclude that Reyes has not established that Mr. Cohen's failure to introduce the July 16, 2006 Einstein records at trial had any effect on the trial's ultimate outcome. The Government has presented Dr. Hood's expert witness report, which supports the factual testimony at trial that Reyes was hit on the head with a blunt object. In addition, the overwhelming evidence at trial established that Reyes attempted to rob the Gomez Grocery and was hit on the head with a jar during a struggle for his gun. The impeachment value of medical records that would have reflected that he was shot during that attempted robbery would have therefore been minimal. We thus conclude that Reyes has not established prejudice on this ground for relief, and accordingly, we deny Ground Four insofar as Reyes argues that Mr. Cohen was ineffective for failing to obtain and introduce medical records at trial.[6]

---

[6]Reyes also asserts that his appellate counsel was ineffective for failing to raise each of the issues raised in the instant § 2255 Motion on direct appeal. Because his underlying claims lack merit, his appellate counsel was not ineffective for failing to raise those meritless claims on direct appeal. Sanders, 165 F.3d at 253-54 (citations omitted).

C.    Reyes's Motion for Leave to File an Amended § 2255 Motion

On July 1, 2013, Reyes filed a Motion for Leave to File an Amended § 2255 Motion, seeking to assert six claims for relief: (1) his trial counsel was ineffective for failing to obtain and present at trial medical records that would have impeached the Government witnesses' account of the attempted robbery; (2) violation of his Fifth Amendment right to have the fact that he discharged a gun found beyond a reasonable doubt, pursuant to Alleyne v. United States, 133 S. Ct. 2151 (2013); (3) violation of his Sixth Amendment right to have a jury find that he discharged a gun, pursuant to Alleyne; (4) the Indictment failed to put him on notice that he was charged with discharging a gun, pursuant to Alleyne; (5) he is actually innocent of the § 924(c)(1)(A) count insofar as he was found to have discharged a gun; and (6) his appellate counsel was ineffective for failing to raise on direct appeal the argument subsequently adopted by the United States Supreme Court in Alleyne.  "[A] motion for leave to amend . . . [is] addressed to the sound discretion of the district court," Cureton v. Nat'l Collegiate Athletic Ass'n, 252 F.3d 267, 272 (3d Cir. 2001), but "the Court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).  Under Federal Rule of Civil Procedure 15(a), "futility of amendment is a sufficient basis to deny leave to amend."  Great W. Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159, 175 (3d Cir. 2010).

We have already concluded that Claim One of Reyes's Amended § 2255 Motion, in which Reyes again argues that Mr. Cohen provided ineffective assistance for failing to obtain and present at trial Reyes's medical records, is meritless.  Claim Five, in which Reyes asserts that he is actually innocent of discharging a gun under § 924(c)(1)(A), was not raised on direct appeal and is thus procedurally defaulted.  See Hodge, 554 F.3d at 379.  However, "courts will

exempt a movant from [the procedural default] rule if he can prove . . . that he is actually innocent of the crime for which he was convicted." Id. (citation omitted). Reyes relies on his July 16, 2006 medical records to support his claim that he did not fire a gun during the attempted robbery. As explained above, the evidence in those records is consistent with the trial testimony of the Government witnesses and, moreover, falls far short of establishing as a fact that Reyes is actually innocent of firing a gun. Reyes therefore cannot excuse his procedural default on Claim Five. Accordingly, Claims One and Five of Reyes's Amended § 2255 Motion are meritless, and we deny him leave to amend to assert those claims based on futility.

In Claims Two, Three, and Four of the Amended § 2255 Motion, Reyes argues that his conviction and sentence are unconstitutional because they violate the United States Supreme Court's holding in Alleyne, and in Claim Six, Reyes argues that his appellate counsel was ineffective for failing to raise the argument subsequently adopted by the Supreme Court in Alleyne. (See Am. § 2255 Mot. at 8-10, 13-14.) In Alleyne, a jury convicted the defendant of, inter alia, using or carrying a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A). Alleyne, 133 S. Ct. at 2155-56. Section 924(c)(1)(A) carries a statutory mandatory minimum sentence of five years. Id. at 2155 (quoting 18 U.S.C. § 924(c)(1)(A)). At sentencing, the court found by a preponderance of the evidence that Alleyne had also "brandished" the firearm, which increased his statutory mandatory minimum sentence to seven years. Id. at 2156. The sentencing court explained that under Harris v. United States, 536 U.S. 545 (2002), the fact that Alleyne "brandished" a firearm was a sentencing factor that the court could find by a preponderance of the evidence. Alleyne, 133 S. Ct. at 2155. The court sentenced

Alleyne to seven years of imprisonment on the § 924(c)(1)(A) count, and the United States Court of Appeals for the Sixth Circuit affirmed.  Id.

On appeal to the United States Supreme Court, Alleyne argued that Harris could not be reconciled with the rule in Apprendi v. New Jersey, 530 U.S. 466 (2000), in which the Court held that any "'facts that increase the prescribed range of penalties to which a criminal defendant is exposed' are elements of the crime" which must be found by the jury.  Alleyne, 133 S. Ct. at 2160 (quoting Apprendi, 530 U.S. at 490).  The Supreme Court in Alleyne agreed and held that "[m]andatory minimum sentences increase the penalty for a crime.  It follows, then, that any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury."  Id. at 2155.  The Court thus overruled Harris, which had limited the rule in Apprendi to facts that increased a defendant's statutory mandatory maximum sentence.  Id. at 2155, 2157-58. Accordingly, the Court found that Alleyne's Sixth Amendment right to a jury trial was violated when the sentencing court, rather than the jury, found that he had brandished a firearm, because that fact increased his statutory mandatory minimum sentence.  Id. at 2163-64.

Here, Reyes was charged with using and carrying a firearm during and in relation to a crime of violence, in violation of § 924(c)(1)(A).[7]  (Indictment at 3.)  During trial in 2007, Mr. Cohen requested special jury interrogatory questions on the verdict sheet regarding whether the

---

[7]Section 924(c)(1)(A) provides, in pertinent part, that anyone who "uses or carries a firearm" in relation to a "crime of violence" shall:
>    (i)  be sentenced to a term of imprisonment of not less than 5 years;
>    (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and
>    (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.
18 U.S.C. § 924(c)(1)(A).

jury found as a fact that Reyes brandished or discharged a firearm during the attempted robbery. (N.T. 08/30/07 at 120-21.) We ultimately decided that, pursuant to Harris, whether Reyes brandished or discharged a firearm was a determination for the court at sentencing rather than a jury question, and we denied Mr. Cohen's request. (Id. at 173-75; N.T. 09/04/07 at 2.) Accordingly, the jury was instructed that to convict Reyes of violating § 924(c)(1)(A), it had to find that he "actively employed a firearm during and in relation to the crimes charged in the [I]ndictment," but that "[t]he Government is not required to show that [Reyes] actually displayed or fired the weapon." (N.T. 09/04/07 at 61.) The jury found Reyes guilty of violating § 924(c)(1)(A).

The Presentence Investigation Report nonetheless indicates that Reyes fired at least two rounds from his firearm during the attempted robbery. (PSI ¶¶ 9, 24.) It also states that Reyes was subject to a ten-year statutory mandatory minimum sentence on the § 924(c) count, which reflects the mandatory minimum sentence for cases in which a firearm has been "discharged" under § 924(c)(1)(A)(iii). (Id. ¶ 66.) At sentencing, we adopted those findings and conclusions in the Presentence Investigation Report. (12/03/08 Sentencing Hr'g Tr. at 5.) Accordingly, we sentenced Reyes to the statutory mandatory minimum term of imprisonment of ten years on the § 924(c) count. Reyes now relies on Alleyne to argue that, because a finding that he discharged a firearm during the attempted robbery increased his statutory mandatory minimum sentence, that fact was required to be charged in the Indictment, submitted to the jury, and found beyond a reasonable doubt. (See Am. § 2255 Mot. at 8-10.)

Reyes filed his Motion for Leave to File an Amended § 2255 Motion to assert his Alleyne claims on July 1, 2013. Under the Antiterrorism and Effective Death Penalty Act of 1996, a one-

year period of limitation applies to motions brought pursuant to § 2255. Section 2255(f) provides that the limitation period shall run from the latest of:

> (1) the date on which the judgment of conviction becomes final;
> [or]
> . . .
> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review . . . .

28 U.S.C. § 2255(f). Reyes filed his Motion for Leave to File an Amended § 2255 Motion more than one year after his conviction became final. However, he filed that Motion within a year after Alleyne was decided, so pursuant to § 2255(f)(3), we may consider his new Alleyne claims if we conclude that Alleyne created a "'right [that] has been [1] newly recognized by the Supreme Court and [2] made retroactively applicable to cases on collateral review.'" United States v. Swinton, 333 F.3d 481, 484 (3d Cir. 2003) (alterations in original) (quoting 28 U.S.C. § 2255(f)(3)).

The parties agree that Alleyne established a new constitutional right under the applicable language of § 2255(f)(3). In Apprendi, the Court held that a fact must be submitted to the jury and found beyond a reasonable doubt if it increases a defendant's statutory mandatory maximum sentence. Alleyne, 133 S. Ct. at 2157 (discussing Apprendi). The Third Circuit has concluded that Apprendi recognized a new constitutional right under § 2255(f)(3). Swinton, 333 F.3d at 485. Because Alleyne simply extended the principle announced in Apprendi to facts that increase a defendant's statutory mandatory minimum sentence, it follows that Alleyne, like Apprendi, established a new constitutional right. See United States v. Eziolisa, Civ. A. No. 10-

039, 2013 WL 3812087, at *2 (S.D. Ohio July 22, 2013) (noting that "Alleyne is the latest in a series of cases following Apprendi" (citations omitted)).

Having concluded that Alleyne recognized a new constitutional right, we reach the issue of the retroactive application of Alleyne. The Government argues that we should deny Reyes's Alleyne claims because Alleyne should not be applied retroactively to cases on collateral review. At this time, neither the Supreme Court nor the Third Circuit has decided whether Alleyne applies retroactively to cases on collateral review.[8] "When analyzing the retroactivity of a new rule of law, we must decide whether the rule is substantive or procedural in nature because 'the Supreme Court has created separate retroactivity standards for new rules of criminal procedure and new decisions of substantive criminal law.'" Swinton, 333 F.3d at 487 (quoting In re Turner, 267 F.3d 225, 229 (3d Cir. 2001)). "'Under the substantive retroactivity standard, the appropriate inquiry is whether the claimed legal error was a fundamental defect which inherently results in a complete miscarriage of justice, and whether it presents exceptional circumstances where the need for the remedy afforded by collateral relief is apparent.'" Id. (quoting Turner, 267 F.3d at 229).

Under the procedural retroactivity standard announced in Teague v. Lane, 489 U.S. 288 (1989), "a new rule of criminal procedure does not apply retroactively to cases that have become

---

[8]The United States Court of Appeals for the Seventh Circuit has noted, without deciding, that because "Alleyne is an extension of Apprendi . . . . [t]his implies that the Court will not declare Alleyne to be retroactive." Simpson v. United States, Civ. A. No. 13-2373, 2013 WL 3455876, at *1 (7th Cir. July 10, 2013) (citations omitted). At this time, three district courts have determined that Alleyne does not apply retroactively on collateral review. See Eziolisa, 2013 WL 3812087, at *3; United States v. Stanley, Civ. A. No. 09-0022, 2013 WL 3752126, at *7 (N.D. Okla. July 16, 2013); Affolter v. United States, Civ. A. No. 13-1413, 2013 WL 3884176, at *2 (E.D. Mo. July 26, 2013).

final before the new rule is announced." <u>Swinton</u>, 333 F.3d at 487 (citing <u>Teague</u>, 489 U.S. at 309-10). However, "[a] new rule of criminal procedure will apply retroactively if it (1) places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe; or (2) requires the observance of those procedures that are implicit in the concept of ordered liberty." <u>Id.</u> (citing <u>Teague</u>, 489 U.S. at 311).

The parties agree that <u>Alleyne</u> announced a new rule of criminal procedure. "Rules that allocate decisionmaking authority" to a jury rather than a judge to "find the essential facts bearing on punishment . . . . are prototypical procedural rules." <u>Schriro v. Summerlin</u>, 542 U.S. 348, 353 (2004) (citing cases). The rule announced in <u>Alleyne</u> falls squarely into that category of rules. Moreover, <u>Alleyne</u> simply extended the principle established in <u>Apprendi</u>, and the Third Circuit has concluded that <u>Apprendi</u> itself announced a new rule of criminal procedure. <u>Swinton</u>, 333 F.3d at 489. We therefore agree with the parties and conclude that <u>Alleyne</u> announced a new rule of criminal procedure.

Since Reyes seeks the benefit of the new rule of criminal procedure announced in <u>Alleyne</u>, we must decide whether that rule falls within one of <u>Teague</u>'s two narrow exceptions to non-retroactivity. Reyes argues that <u>Teague</u>'s second exception applies.[9] The scope of <u>Teague</u>'s second exception "'is clearly meant to apply only to a small core of rules requiring observance of those procedures that . . . are implicit in the concept of ordered liberty.'" <u>O'Dell v. Netherland</u>, 521 U.S. 151, 157 (1997) (alteration in original) (quoting <u>Graham v. Collins</u>, 506 U.S. 461, 478

---

[9]Reyes also argues that <u>Teague</u> should not be used at all to determine whether a new rule of criminal procedure applies retroactively on a § 2255 motion, but concedes that "[u]nder controlling Third Circuit precedent . . . this Court is bound to apply <u>Teague</u>." (Reply Mem. in Support of Mot. for Leave to File an Am. § 2255 Mot. at 16.)

(1993)).  It is "reserved for watershed rules of criminal procedure that not only improve the accuracy of trial, but also 'alter our understanding of the bedrock procedural elements' essential to the fairness of a proceeding."  Swinton, 333 F.3d at 487 (quoting Sawyer v. Smith, 497 U.S. 227, 242 (1990); and citing Teague, 489 U.S. at 311).  "Because we operate from the premise that such procedures would be so central to an accurate determination of innocence or guilt," it is "unlikely that many such components of basic due process have yet to emerge."  Graham, 506 U.S. at 478; see Reinhold v. Rozum, 604 F.3d 149, 155 (3d Cir. 2010) (noting that since Teague was decided, the Supreme Court has not found any rule to satisfy Teague's second exception).

To determine whether the rule announced in Alleyne is a "watershed rule" of criminal procedure, we must consider whether it improves the accuracy of a criminal proceeding.  See Summerlin, 542 U.S. at 355-58.  "[T]he accuracy element of the watershed exception derives from the function of habeas corpus to 'assure that no man has been incarcerated under a procedure which creates an impermissibly large risk that the innocent will be convicted.'"  Swinton, 333 F.3d at 490 (quoting United States v. Moss, 252 F.3d 993, 998-99 (8th Cir. 2001)).  "'That a new procedural rule is fundamental in some abstract sense is not enough; the rule must be one without which the likelihood of an accurate conviction is seriously diminished.'"  Reinhold, 604 F.3d at 155 (emphasis in original) (quoting Summerlin, 542 U.S. at 352).

Like Apprendi, the rule in Alleyne "affects only the enhancement of a defendant's sentence after he or she has already been convicted by proof beyond a reasonable doubt."  United States v. Jenkins, 333 F.3d 151, 154 (3d Cir. 2003) (discussing Apprendi).  The Third Circuit has recognized that "[j]udicial fact finding at the sentencing stage . . . 'does not impair the jury's ability to find the truth regarding the defendant's involvement in the underlying offense.'"

Reinhold, 604 F.3d at 155 (quoting Jenkins, 333 F.3d at 154)). Consequently, it is clear that Alleyne does not improve the accuracy of determining the guilt or innocence of a defendant. Rather, like its predecessor Apprendi, the accuracy improved by Alleyne "is in the imposition of a proper sentence." Swinton, 333 F.3d at 490 (citing United States v. Brown, 305 F.3d 304, 309 (2002)). Although "many reasons can be marshaled to defend the practice of having the jury act as fact finder over a single judge, there is enough principled disagreement on the issue that 'we cannot confidently say that judicial factfinding seriously diminishes accuracy.'" Reinhold, 604 F.3d at 155 (quoting Summerlin, 542 U.S. at 356).[10]

We must also consider whether Alleyne "alter[s] our understanding of bedrock elements essential to a fundamentally fair proceeding." Swinton, 333 F.3d at 491 (citing Sawyer, 497 U.S. at 242). Contrary to Reyes's position, "[t]he Supreme Court has considered and rejected the claim that a new rule prohibiting judicial fact finding at sentencing is a watershed rule." Reinhold, 604 F.3d at 155 (citing Summerlin, 542 U.S. at 355-58); see United States v. Sanders, 247 F.3d 139, 148 (4th Cir. 2001) (noting that "a rule which merely shifts the fact-finding duties from an impartial judge to a jury clearly does not fall within the scope of the second Teague exception" (citing Neder v. United States, 527 U.S. 1 (1999))). The Third Circuit has determined

---

[10]Reyes argues that we should not rely on Swinton and Reinhold, in which the Third Circuit determined that Apprendi and a case extending Apprendi should not be applied retroactively on collateral review, for guidance in determining whether Alleyne applies retroactively on collateral review. Reyes contends that, in those cases, the Third Circuit made a "faulty distinction between punishment and guilt" in connection with its conclusions that Apprendi does not sufficiently improve accuracy to trigger Teague's second exception. (Reply Mem. in Support of Mot. for Leave to File an Am. § 2255 Mot. at 12-14.) We reject Reyes's argument because Alleyne is simply an extension of Apprendi, and the Third Circuit has consistently applied the same analysis in determining that judicial factfinding at sentencing does not sufficiently improve accuracy to trigger Teague's second exception. We find no compelling reason to depart from that reasoning here.

that <u>Apprendi</u>, <u>Alleyne</u>'s lineal predecessor, does not require observance of procedures "implicit in the concept of ordered liberty." <u>Swinton</u>, 333 F.3d at 490, 491. Because it is clear that the constitutional principles recognized in <u>Alleyne</u> are indistinguishable from those endorsed in <u>Apprendi</u>, an <u>Alleyne</u> violation, like an <u>Apprendi</u> violation, "does not necessarily undermine the fairness of judicial proceedings." <u>Id.</u> at 490 (citation omitted).

For all of these reasons, we conclude that the rule announced in <u>Alleyne</u> does not satisfy <u>Teague</u>'s second exception to non-retroactivity. Therefore, <u>Alleyne</u> does not apply retroactively to cases on collateral review, and Reyes is not entitled to relief on Claims Two, Three, and Four asserted pursuant to <u>Alleyne</u> in his Amended § 2255 Motion. In addition, Claim Six, in which Reyes asserts that his appellate counsel was ineffective for failing to raise an <u>Alleyne</u> argument on direct appeal also fails, because at the time of his appeal, <u>Harris</u> remained good law, and Reyes's appellate counsel was not ineffective for failing to raise an argument foreclosed by controlling case law. <u>See</u> <u>Sistrunk v. Vaughn</u>, 96 F.3d 666, 670-71 (3d Cir. 1996) (finding that counsel was not ineffective in failing to raise a claim on appeal where, under the governing law at the time of the appeal, the claim "would have been doomed to failure"). We thus conclude that all of the claims asserted in Reyes's Amended § 2255 Motion are meritless, and accordingly, we deny the Motion for Leave to File an Amended § 2255 Motion as futile.[11]

---

[11]Reyes also asks that we grant a new trial on the basis of cumulative error. To prevail on a claim of cumulative error, Reyes must show that the alleged errors "when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial." <u>United States v. Thornton</u>, 1 F.3d 149, 156 (3d Cir. 1993) (quotation omitted). Reyes did not raise this claim on direct appeal, and thus it is procedurally defaulted. Even if it were not procedurally defaulted, we would still reject this claim because none of Reyes's underlying claims have merit.

However, we may issue a certificate of appealability if we determine that Reyes "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003) (citation omitted). Because the Third Circuit has not yet had occasion to address whether Alleyne announced a new rule of criminal procedure that applies retroactively to cases on collateral review, and because no other court of appeals has yet answered that question, we conclude that reasonable jurists could find our assessment of the retroactivity of Alleyne to be "debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). We therefore grant a certificate of appealability limited to the issue of whether the decision of the United States Supreme Court in Alleyne applies retroactively to cases on collateral review.

IV.     **CONCLUSION**

For the foregoing reasons, we deny Reyes's Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255 in its entirety. We also deny Reyes's Motion for Leave to File an Amended § 2255 Motion. At the same time, we grant a certificate of appealability limited to the following issue: whether the decision of the United States Supreme Court in Alleyne v. United States, 133 S. Ct. 2151 (2013), applies retroactively to cases on collateral review. An appropriate order follows.

BY THE COURT:

/s/ John R. Padova

_____

John R. Padova, J.